Good morning and may it please the court, Tim Wilborn for Mr. Cadena. I'm not really sure what the issue is in this case that the court is focused on, that the court wants to hear about. I read the briefs and I didn't see anything that needed additional comment in my perception and so I filed a motion to submit it on the brief which was denied which I assume means that one or more of the judges I'll be happy to answer your question, counsel. You made a substantial argument in your brief that the Waddell's test has been discredited and should not be used. I'd like you to elaborate on that and I'm going to ask the government the same question because the government did not respond to your argument in its brief. Okay, let me elaborate. First of all, I wouldn't say that the Waddell's test has been totally discredited. We've heard several social security cases this week and a number of them did have doctors who used Waddell's test as a way of trying to discern who was aggrandizing their symptoms. Okay, well, your honor, I wouldn't say that it's been discredited. I would say that it's been misinterpreted often because what's really happened is that the Waddell's test originally was designed by Dr. Gordon Waddell to determine whether or not lobe back pain is purely physically based or whether there are some other factors at work. Now, Dr. Waddell never intended for this test to be a test of malingering. He intended the test to be a method by which you could determine whether it was a purely physiological generation of pain in the low back or whether there were other factors, and by other factors, I mean psychological factors. In my brief, there's a section, I can't remember which brief, but it talks, I think it's in the reply, it talks fairly extensively about, well, it must be in the opening. It talks extensively about... Is it just simply one diagnostic tool? So could somebody use it as a way of establishing lower back pain as well as sort of denying that there's a physiological cause for low back pain? Is it only a way of showing the negative? No, you can't diagnose low back pain with it. You can only determine whether the low back pain, which has already been diagnosed, is purely physiologically based versus based on other factors, such as somatoform disorder. Lower back pain is usually a soft tissue injury that's sort of devilishly difficult to diagnose. Correct. You have the bones of the spine, and then there are holes, and the pairs of nerves exit at each level, and if one of those nerves gets irritated, that causes pain. There are also other ways that low back pain can be generated. The facet joints, where the back moves back and forth over itself, if those become inflamed, that can cause low back pain. But that's usually kind of an aching pain rather than a stabbing, you know, electricity jolt type of pain. So did Dr. Nolan properly employ Waddell's test here? It's my belief that he did not, because this claimant has a documented impinged nerve in his neck, and the Waddell's test that Dr. Nolan employed, you have the patient sit in a chair and you push down on their head. That's called the axial loading test. And when you perform that test, as a doctor, you say, does this hurt? Well, if you have an impinged cervical nerve, of course the claimants, or they call them patients, of course the patient is going to say, yes, that hurts. And, in fact, Mr. Kadena did say, yes, that hurts. And so I think that's a misuse of the Waddell's test, because the Waddell's test isn't a back pain test, you know, head to sacrum. It's a back pain test for lumbar pain. And if you misuse it on somebody who has other confounding conditions, such as fibromyalgia or somatoform disorder or, as was the case here, the cervical nerve impingement, it won't work. Let's suppose that we agreed with you that Dr. Nolan improperly used Waddell's test in this case and we were to decide that we should disregard that portion of Dr. Nolan's assessment. How does that affect the ALJ's decision? Well, I think that Dr. Nolan's assessment is pretty much entirely contaminated by that misperception that the Waddell's test was positive. Mr. Wolvern, this kind of puzzles me a little bit, because whether or not the Waddell's test, you know, has a lot of credibility anymore for a variety of other purposes, the ALJ here didn't rely on it. He did rely on that part of Dr. Nolan's assessment in which Nolan talked about the pain being rated on a scale, on a ten-point scale as 11, and he said that is like a positive Waddell's testing. So he didn't say it was a Waddell's testing and, therefore, he was fudging. So how could it make any difference here? I mean, what are we talking about? I think it does make a difference, Your Honor, because if you look at page A30 of the first volume of the transcript or the excerpt, that's the skinny one, in the indented paragraph, ALJ quotes extensively from Dr. Nolan. Including what I just quoted from. Exactly. Including what I just quoted. Exactly. And so... He says it's like a Waddell's test. He doesn't rely on the results of the Waddell's test in this paragraph. He does, though. He says the positive axial load test, that's the Waddell's test. He doesn't call it a Waddell's test. He calls it a positive axial load test, but that is the Waddell's test. It's the same thing. He also, as you correctly point out, Your Honor, he does rely on the claimant saying, I hurt so bad that on a scale of 1 to 10, I'd rate it as an 11. I think that's evidence of pretty poor coping skills on the part of the claimant, but we see it a lot in disability cases where claimants either are disabled or whether or not. Okay. Mr. Wilburn, you've only got about two minutes left, but since you came all the way from the Portland area to see us today and we only have two cases scheduled for argument, we have a little time, so you can use that time and we'll give you an extra couple of minutes for rebuttal. Thank you, Your Honor. Good morning, Your Honors. Tom Ellsbury for the Commissioner of Social Security. I'll address the Waddell's issue straight away. Counsel, I have to tell you I'm a little concerned because Mr. Wilburn spent probably three pages in his brief addressing Waddell's and I didn't find any reference at all in your brief to it. I think there was one reference maybe on page 20, but you didn't address any of the medical evidence or the fact that Waddell had written a subsequent article, and so I'm wondering whether the government's conceding that Waddell was misused here. No, to the contrary. There is absolutely no evidence or discussion of Waddell's in the record before the ALJ, so it's not an issue. It was used by the district court and it was mentioned by the ALJ. It was mentioned at least twice by the ALJ. The sufficiency of Waddell's as a medical diagnostic tool was never at issue before the ALJ. So to put it as an issue before the district court or before this court, I think, is a little too late. It was not challenged. In fact, it might have been helpful if you had made that argument in your brief. That's true. I agree with you. There's nothing in this record, as I read it, if you're going to take on the Waddell's test, first of all, it's got to be directly relied on. And secondly, you can't do that by reference to some law review article, can you? Exactly. I would agree with that fully. First off, as I think you were alluding to in your question for Mr. Wilborn, there are other elements that Dr. Nolan relied on to find that his presentation was not credible. His fake twitching or the twitching that was determined to cease once he started or once he was distracted, the pain on a scale of 11, on a scale of 1 to 10. Hold on. Excuse me. Kathy, the clock isn't running. Oh. Okay. Thank you. And in addition, I agree completely. It's still not running. The Attica suite, whether Dr. Waddell's signs are in controversy or not, was never before the ALJ. And to present it now is to present one side of it. I agree. I probably should have addressed it more in this case. I did in an earlier case that was also before this panel earlier this week. At length, it's so long ago now I'm at a loss to explain why I chose not to, other than I believe in that case it was before the ALJ and challenged, and here it was not. And the standard here is whether the ALJ's decision is supported by substantial evidence and free of legal error. So even if the Waddell's diagnostic tool is at issue, and this part of the medical field says it's a problem, and this part of the medical field says it's great to use this way, it's the ALJ's job to resolve that conflict within the medical evidence, resolve any ambiguities, and reach a decision. Thomas said he held that in 2008. That's what he did here. He did cite the Waddell's as something that Dr. Nolan relied on. I think properly. Mr. Cadena's counsel at the hearing, a supplemental hearing that was called specifically to question Dr. Nolan, was specifically questioned about Waddell's science. But he was never questioned about whether this was an applicable diagnostic tool. He just questioned him about how he used it. I think Mr. Wilburn was very candid in telling the court that he was not challenging the use of Waddell's test in all cases. But he thought that it was not properly applied here. So how do you answer that? In two ways. First off, he's wrong. Dr. Nolan explained how he applied it, and it's contrary to how Mr. Wilburn explained. And I'll go to that in one second, but I don't know Mr. Wilburn's medical expertise and foundation for testifying to Dr. Nolan, an acceptable medical source, misapply a tool. And again, that was never raised or challenged before the ALJ. There's no indication in the record that this was misapplied until we get before the courts. That said, Mr. Wilburn's talking about the axial load test being misapplied because he had cervical as well as lumbar. Dr. Nolan noted that. And in his testimony he says, I tested for back pain, not for neck pain. When they complain, he noted the neck pain, when they complain of lower back pain on the axial load, not neck pain, lower back pain, that's a negative Waddell sign. Because it shouldn't cause pain in the back. Mr. Wilburn's talking about pain in the neck. That's not what Dr. Nolan was looking at. He was watching for signs of pain in the back, which there should have been none. So his argument that it was inappropriately applied, I think, fails on that basis alone. How do you answer Mr. Wilburn's argument that Dr. Nolan was an internist, whereas Dr. Burt was an orthopedist? How do we weigh the difference in their medical specialties? Well, Dr. Nolan was an internist with 10 to 15 or 15 to 20, I can't remember, I believe, to err on the low side, 10 to 15 years experience. Dr. Burt, I believe, saw Mr. Kadena two or three times. The only significant evidence discussed by either Mr. Kadena or myself in the briefing refers to two or three visits. How many times has Dr. Nolan seen? Saw him once. I think the question specifically went to the question of specialty. How did the ALJ, I'm a little concerned that the ALJ is taking the word of an internist over the word of an orthopedist, which would seem to be the orthopedist's specialty. And did the ALJ adequately explain that? I believe they adequately explained it. One example, let me back this up a second. The aspect of Dr. Burt's opinion that was rejected by the ALJ was the opinion of disability, not able to stand more than two hours, not able to crawl, kneel, those elements of his opinion. That was the specific aspect rejected. Dr. Burt himself, as the ALJ noted, found no limitation in lower extremities during his objective, his clinical notes. It was in the ROC that was not apparently based on as thorough of an objective evaluation as Dr. Nolan's. If you look at Dr. Nolan's testing, it's clear there are very, very detailed objective testing of his abilities, his ability to stand, sit, carry weight, where that's not the case with Dr. Burt's ROC. His opinion of disability comes out of nowhere. Mr. Wilburn references the fact that Dr. Burt in fact diagnosed or noted radiculopathy. He did not do so. He noted Mr. Kadena's report of radiculopathy. But then his ultimate diagnosis didn't mention radiculopathy. It just said lower back pain. So the ALJ's responsibility is to weigh a medical source who's an expert in that field with other acceptable medical sources and weigh them according to how they're supported by the record. So in this case, Dr. Nolan, an internist with 10 to 15 years' experience evaluating these claims, it's so stated on the record when he was questioned. Dr. Burt issues a conclusionary opinion of disability, not supported by any objective evaluation or testing, and actually contrary to some of his own comments. No limitation in his lower extremities. Actually, excuse me, more accurately stated, full strength in the lower extremities. So, yes, the record supports the ALJ's review and reliance on Dr. Nolan over Dr. Burt's opinion of disability, for which the record carries virtually no support. And while Mr. Wilburn makes some very good arguments, the standard of review is whether the ALJ's decision is supported by substantial evidence. And it is here. Mr. Ellsworthy, you still have time left, but because the clock wasn't running at the start by technological error of some kind, you don't have to use it all up. Okay. And if there are no further questions on Waddell's, and if that's the chief interest, I've had... Let me... Judge Biby, do you have more questions? No, I don't. Thank you. Judge Reimer? No. No questions. Thank you. Okay, Mr. Wilburn. To add two minutes to the... I'd like to respond to the allegation that this contesting of the Waddell, the use of the Waddells here wasn't raised in agency proceedings. First of all, it was raised at the Appeals Council, and that is on excerpts page 340 in the large volume. It was raised at the hearing and discussed, page 383, and thereat... Hearing before the ALJ or hearing before the district court? There was no hearing before the district court, Your Honor, but it was the hearing before the ALJ, page 383 and 4, and I think what happened there is that Dr. Nolan admitted that it's reflective of a non-organic presentation. That's on page 384, and he didn't say it was reflective of malingering, and there's a huge difference there, I believe, and so Mr. Tilton, the claimant's administrative attorney, didn't pursue the matter further. He did pursue the matter very much further in his Appeals Council brief, starting on page 340, after the ALJ relied extensively on this in discrediting the claimant. I think it's logical to conclude that at the hearing, Mr. Tilton believed that the issue was resolved by Dr. Nolan's admission that it was indicative of non-organic symptoms, and then when the ALJ misused these findings, he extensively briefed us before the Appeals Council. Now, the question about can you rely on some law review article, well, it wasn't a law review article. It was a medical article. It was a medical article, and he scientifically... Well, my point is still the same. That's an unauthenticated article so far as any court proceeding is concerned. I mean, I can't imagine, particularly in an administrative hearing, relying on a law review article review. I'm not suggesting, Your Honor, that we rely on a law review article. What I'm saying is that this journal, Spine, is a peer-reviewed medical journal, and it has that expertise that's required by the Supreme Court case law. I don't doubt that. I mean, you know, I don't doubt that in the air at all. But my point is you can't, it's not, we can't, our review of an administrative agency is for substantial evidence. That's correct. Even if you could reverse a district court on the basis of a medical journal, which is inconceivable to me that was not presented in court in an opinion by an expert who was there present expressing it, I don't see how in the world we could rely on a law review article in an administrative agency review. How can we? Well, Your Honor, it is acceptable expert evidence. But we don't know that. How can the article, go ahead. I'm sorry. No, go ahead. The article couldn't be cross-examined, right? I mean, it is, it may be expert medical journal, medicalese, but it's an article. If it's not presented by a medical expert. Your Honor. How can questions be asked? Wasn't the invention of Waddell's signs itself the same type of thing that these medical journal, where Dr. Waddell clarifies the signs? I mean, Waddell's signs are named after Dr. Gordon Waddell. He invented them. He said, I have figured out that you can use these five tests, and we're going to, somebody somewhere said, we're going to call that Waddell's signs. He just made it up. It's no less reliable than the article where he clarifies it. But if somebody relied on it in a hearing, then they testified, I'm relying on that. And then advocates could bring that out. Other advocates could cross-examine them and say, well, is there a weakness in this? It seems odd to rely on a medical journal without a witness to me. Well, it appears that Dr. Waddell's original proposal has acquired a life of its own, which has been medically accepted by others. Whether Waddell wants to disavow it or not, it's acquired an institutionalization. He's not disavowing it, Your Honor. That I would like to make clear. He's simply stating that when he originally came up with these criteria, they were intended to be very narrowly construed. And people later on started misconstruing them, and that is when he decided that he needed to speak out and say, wait a minute, people. You've taken this way too far. These Waddell's signs named after me weren't ever intended to diagnose malingering. They were only intended to separate physiological from non-organic signs. And moreover, they are inappropriate where you have confounding factors such as the neck thing. So I think that relying on Dr. Waddell's own peer-reviewed medical journal article, explaining that people are misusing his criteria is perfectly appropriate. I mean, who would better be able to explain that? You could rely on that, but don't you have to have a witness to testify about it, other than yourself as a lawyer?  If the concern here is that we don't have a witness, then I would suggest to this court that the appropriate remedy herein is to remand this case to an ALJ for further proceedings with instructions to consider Dr. Waddell's clarifications and to call an expert witness, a medical advisor, to the hearing to address specifically these points. Because I think it's clear an error has been made here, and this disabled claimant is never going to get his disability benefits, his date last insured has expired, unless this error is corrected. I really would hate to see this court turn this man's case down on the basis of an evidentiary issue. I think if to address your... However, this is an administrative agency review. What authority do we have to do that? If the record supports you, fine. I have no trouble reversing, remanding, whatever. But what authority do we have to reverse and remand for taking more evidence in an administrative hearing based on nothing that's in the administrative record? Our review is limited to the administrative record, isn't it? Well, Your Honor, it is. And this evidence is in the administrative record beginning on page 340. Yes. And there's nothing in the administrative record that challenges it on the basis of the journal article. The journal article is cited extensively beginning on page 340 of the administrative record. And in a brief to the appeals counsel. Correct. Well, that's not part of the record. I mean, it's part of the record in the loose sense, but it's not part of what we review. We're reviewing the ALJ's determination, aren't we? Yes. But in the Ramirez case, this court, which I was just reading yesterday, and I noted that you were on the Ramirez panel, you held that in conducting the court review, this court considers not only the evidence that was before the ALJ, but also the evidence which was before the appeals counsel. Yes, but a brief is not evidence. There wasn't a declaration put in with the brief asking the appeals counsel to take it into consideration. It was just a brief. I mean, I love briefs, but briefs aren't evidence. I love briefs, too, and sometimes they win. And yours may. Well, I see my time has far more than expired. We tried to draw you out because we sort of shanked you to come up here from the Portland area, and we appreciated that. We do appreciate you coming, counsel, to answer our questions. Thank you. Okay. The case of Cadena v. Estrue shall be submitted on the briefs.
judges: Rymer, Gould, Bybee